## WEAR AND HICKMAN v. BRYANT.

MAY TERM, 1838.

Wear & Hickman v. Bryant.

1. The act of Congress of Feb. 17, 1815, for the relief of the inhabitants of New Madrid who had suffered by earthquakes, provides that the title of the person who proposes to avail himself of the bounty of Congress to the injured lands shall revert to the United States. In establishing his title to land located under this act, the claimant need not prove any formal relinquishment to his New Madrid lands. His acceptance of the provisions of Congress, as evidenced by his application to the Recorder, and his location by the Surveyor, is a virtual relinquishment of his injured land, and assuredly the United States only could complain of the want of a formal conveyance.

2. Under the provisions of this act, the certificate of the Recorder was issued to the confirmee or his legal representatives, which representatives are those claiming under him by purchase or descent. If this certificate has been issued, and the location made without the consent of the confirmee or his legal representatives, yet, if they subsequently assent, either expressly or impliedly, the location will enure to their benefit.

3. The *intention* of the holder of a New Madrid certificate, in locating for himself, can have no influence in determining the rights of the parties. The bounty of Congress was to the owners of the injured lands, and they only, or those deriving title from them by descent or purchase, can be entitled to locate, or to the benefit of the located land; and if any other individual, by fraud or otherwise, get possession of the certificate, it is unavailable to him, unless he be also the descendant or purchaser from the confirmee. Any other construction would frustrate the intentions of Congress; and would not only deprive the sufferer, for whose benefit the act was passed, of his location, but also of his New Madrid land.

4. Nor has the locator the *legal* title. Such a location bears no analogy to the case of one man's purchasing land with another's money—the certificate under which the location is made, being granted only on cond'tion that the injured lands revert to the United States, which condition is not complied with where the certificate holder is not also the owner of the injured land or one claiming under him. The certificate is therefore valueless—nor is it *money* or equivalent to money or any negotiable paper, and therefore could not come within the principle alluded to.

5. Where the intent of the law maker is plain, contemporaneous construction is entitled to little or no weight in settling the law—especially where that construction is one-sided or founded upon the opinions of those interested in fixing the construction in the manner contended for by the party using their opinions as argument.

6. EDWARDS, Judge, dissented from the opinion of the court—affirming the judgment below, on the ground that the plaintiff below failed to make out a complete legal title, having offered in evidence only the certificate of the Recorder and the *application* to the Surveyor to locate—but no actual location—no plat of survey—no notice of the Surveyor, &c. as required by the act of Congress.

ERROR to the circuit court of Howard county.

*Wilson,* of Howard, for plaintiff in error:

The plaintiff insists on the following points:

1. That the court erred in giving the instructions asked by plaintiff—1 Marshall's R. 356.

2. That the certificate, location, &c. were not duly

MAY TERM,
1838.

Wear & Hickman
v.
Bryant.

certified, and ought not to have been received in evi-
dence.

3. That the New Madrid certificate is void for uncer-
tainty—4 Cruise's Digest, 206, top paging; 2 Bacon, 653.

4. That it is void, because St. Aubin was dead be-
fore it issued—see 7th instruction refused; 1 Marshall's
R. 99, 356, 293; void, because the recorder did not pur-
sue the law—see 2 Con. R. 151, 154; 5 Con. R. 672, 28.

5. That the court erred in refusing to give the 3d and
4th instructions asked by the defendant, which require
the plaintiff to show that the land in New Madrid had
been relinquished to the United States.

6. That the court erred in refusing to instruct the jury
that it was necessary for the plaintiff to show that the
location was made by Louis St. Aubin, his children, or
those legally claiming under them.

7. That the court erred in telling the jury that there
was evidence of consent of Louis St. Aubin's heirs.

8. That the court erred in refusing the 11th instruc-
tion of the defendant, that the deed from Martin and
wife conveyed no interest to sustain this action.

9. That the court erred in refusing to give the 12th
instruction asked by defendant.

10. That the court erred in not giving the 14th in-
struction asked, which says that there is evidence that
Hickman located for himself.

*Hayden*, for the same:

In this cause it is admitted by the parties, that the cer-
tificate of new location by which the land in controver-
sy was located, gave the right of location to Louis St.
Aubin or his legal representatives. But it is insisted by
the defendant that the location was made by him in his
own name, and for his own use, and not in the name of
either Lewis St. Aubin or his legal representatives; that
it is the duty of the court, in the reading and construing
the entry, to interpret it according to the plain meaning
and proper acceptation of its terms, and to be governed
by the same rules of law in the construction of it, which
govern in the construction of all other instruments. This
rule will insure to the parties the object and end for which
it was read to the jury; which object was to show and as-
certain what land was located, by whom located, and for
whom it was located. In reading it, it is manifest that
Hickman located it for himself and not for another.
For if he had intended to locate the land for St. Aubin,
or any other person, the entry would and should have so

expressed it, according to the requirements of a plain well settled rule of law, that when a thing is written we are bound to believe that the writer expressed his intention and intended to record what he wished, leaving nothing for construction beyond or behind the instrument. That if he had intended to locate the land for St. Aubin, he would have had the entry made thus: "Louis St. Aubin by Thomas Hickman, his agent, enters, &c. land in virtue of certificate No.—" &c., instead of having the entry made, that Thomas Hickman, as the legal representative of Louis St. Aubin, enters, &c., as is the form of entry in this case. It must be conceded that, as the certificate gave the same right to locate to the legal representatives as to Louis St. Aubin, the legal representatives had as much right and power to make it in his own name as had Louis St. Aubin to make it in his name; that this right is as expressly given to the one as it is given to the other; that the law does not require either to endanger his right by having his land designated and set apart from the public lands, by declaring upon a public record that the land is not his, but that it is the land of another. May I not then ask the court, whether Hickman, as the legal representative of Louis St. Aubin, could have more fully and explicitly declared upon that record that he intended to set apart that tract of land to and for himself, than he has and did declare it by his aforesaid entry? And indeed, may I not further ask whether he did not adopt the only form and correct form suitable and necessary to effect the object and to carry into effect his right as legal representative of Louis St. Aubin?

Again, does not the law require that when an agent does an act for his principal, he should do it in the name of his principal; and that if he do it in his own name, the law will consider it his own act, and not the act of the principal? And how obvious the rule and the reason of it. The law cannot look out of the instrument to ascertain the meaning of the party. These positions being too plain to be controverted, I will proceed to consider the rights of the parties in the present action.

I contend that the plaintiff cannot, in this action, oust the defendants from the land; for by the location, so far as it is concerned, and which is the only evidence at law which can inform the court who has possessed himself of the land as against the government, (there being no patent issued,) the right appears to be in Hickman; I mean the right which will maintain the action of ejectment under our statement, in the absence of a perfect

MAY TERM,
1837.

Wear & Hickman
v.
Bryant.

legal right, which can alone be given by the patent, the legal right being yet in the government. Now if this position be correct, the plaintiff cannot recover, and that it is correct, who can doubt it? For, to recover in ejectment the plaintiff must show an entry, which is the only act of appropriation of the land that can be, as against the government; and has the plaintiff shown an entry or appropriation of the land either by himself or by another for him? I answer, no, if the entry is to give evidence of what was the intention of the locator. But I am answered by gentlemen on the other side, that the entry was made by the defendant with another man's certificate, another man's property, another man's money. Agreed; and what will that avail him in the action of ejectment? It would leave in his hands a resulting trust to the estate, and a court of equity would give him the possession of it. But will the gentlemen pretend that a difference exists where a trustee, holding the certificate of another, purchases or obtains land with it, in his own name, and where he holds the money of another to purchase an estate, and the right to the land in either case is an equitable one, and can alone be enforced in a court of chancery, where this party is bound to go, if he has any right? But do gentlemen pretend that the plaintiff can maintain an action of ejectment upon the certificate alone, without an entry, without an appropriation of the land? The statute does not say so; the common law does not say so. Neither the one law nor the other considers it as land, but that it is a statutory thing, giving the plaintiff a right to obtain land; or if purloined from his possession, or faithlessly misappropriated by an agent, he may follow him in equity for the land located. But the gentlemen on the other side, with great ardor and much elocution, picture the distress of the unfortunate owners of land injured in New Madrid by the dreadful earthquakes which gave birth to the highly beneficial act made by the beneficent Congress, if they do not succeed in establishing the principles for which they contend—that the injured will still remain sufferers, and that the benignity of Congress will have become an agent, and means of pampering and sustaining the mercenary and fraudulent!

Does not this court know, and does not the history of the transactions of the very men they fear in their dealings in the claims prove to the reverse? Is it not known to be the case, that in a great majority of cases, the location of lands under the act was made by persons hav-

ing honestly purchased the certificates, either of the true owner, or of some person claiming to be the owner? And do we not know that there have been and now are men roving and stalking the country hunting up the original claimants of those lands, and making inquiry and examination into the regularity and formality of the mesne conveyances, from them down to the honest and industrious occupant, laboring upon and improving the lands located—men, I say, who make it their business to deal in and follow this dirty, miserable calling—men, who, without remorse, without feeling, heartlessly turn women and children from the possession and enjoyment of their lands and comfortable tenements, the work of their own hands?

Since writing the above brief, I have examined Hughes' Reports of decisions of land cases in Kentucky, growing out of entries in that State made in their land offices, and I find that entries, when made by the locator himself, as also when made by an assignee, and by an agent, the record of such entries respectively were made to express by whom and for whom entered; and that, when made, they were construed and looked upon as records, and entitled to due weight, as such—see the book, p. 45, and see the index to the cases at the commencement of the book, where the court will be referred at once to entries in their various shapes, suitable to the rights and capacity of the claimants. I refer to this book for precedents adopted there, and as respectable authority to sustain my views as to the manner in which entries should have been made, and the correct rule of construing them.

*Leonard,* for defendant in error:

In support of the judgment of the circuit court the following points and authorities are relied upon:

First point. The certified copies from the surveyor general's office are, under our statute, evidence *per se* —Rev. Stat. of 1825, title "Evidence," sec. 4; Wear and Hickman v. Bryant, and Tindall v. Johnson, Mo. Rep. 2 Semi-annual Part, 100, 113.

Second point. The deeds from Martin and wife, and St. Aubin and wife, had been duly proved and recorded, and were therefore entitled upon the faith of that probate to go to the jury—Rev. Stat. of 1825, title "Conveyance," sec. 8, 10, 16; Wear and Hickman v. Bryant, and Tindall v. Johnson, Mo. Rep. 2 Semi-an. Part, 106, 113.

Third point. The plaintiff exhibited in evidence a valid title to the land in question.

In support of this position, it is insisted:

1. The legal right conferred by the certificate to appropriate to private use the quantity of land designated, is vested by that instrument in whoever was the owner of the confirmee's title to the injured land, whether that person was the confirmee himself, or his heir, or the assignee in fact of his title.

This instrument is capable of only four constructions in relation to the question upon whom the authority to locate, contained in it, is conferred. Either the certificate is void for uncertainty in the description of its grantee, or the authority to locate, which it contains, is vested exclusively in the confirmee, so as to be dependent for its validity upon the fact of his existence at the time of the grant; or it is vested in whoever was the owner of the confirmee's title to the injured land, whether that person be the confirmee himself, or his heir, or the assignee in fact of his title.

The first of these constructions would avoid all, and the second a large portion of this class of titles. Both of these constructions have, however, already been very properly rejected by this court in the cases before cited of Wear and Hickman v. Bryant, and Tindall v. Johnson.

One or other of the two remaining constructions must therefore be adopted; and in determining which, it will be proper to examine the act of Congress in which this title had its origin, and look to the manner in which that statute was executed by the federal officers charged with that duty.

The first section of the act of 17th Febuary, 1817—Geyer's Digest, 484, 486, declares that all persons owning land in the county of New Madrid, whose lands have been materially injured by earthquakes, shall be entitled to locate the like quantity on any of the public lands of the United States, in Missouri, the sale of which is authorized by law.

The second section declares that the recorder shall, upon its appearing to him that any person is entitled to land under this act, grant to such person his certificate to that effect, and directs the location to be made by the surveyor general, or under his direction.

The third section provides for the issuing of the patent. There are two provisoes to the first section. The first provides that no person shall locate a greater quantity than has been confirmed to him, except the owners of town lots, and fixes the maximum to be located by any one person at 640 acres. The other proviso declares

that, upon a location being made in pursuance of the act, the injured land shall revert to, and become vested in, the United States.

This is the whole statute. No doubt exists as to the intention of the Governmnt in passing it. The lands of the inhabitants of the county of New Madrid had been injured by an earthquake with which that country had been visited; and the United States proposed to indemnify the sufferers by giving them other lands, in lieu of those that, to every beneficial purpose, were supposed to be destroyed. Two modes of carrying the act into execution must have suggested themselves to the recorder. He must either have ascertained who was entitled to the certificate, by investigating and determining the question of title to the injured land, and have granted his certificate specifically to such person, or leaving the question of ownership untouched, and to be afterwards settled in the courts of justice of the country, he must have issued the certificate to the confirmee or his legal representatives, in such manner as to vest the right to locate in the confirmee or whoever had become, by being possessed of the confirmee's right to the injured land, entitled to the benefit of the act. He adopted the latter mode. It was, perhaps, the only safe and practicable method of executing the statute. He issued the certificate in the name of the confirmee or his legal representatives, and the court is now called upon to determine what class of persons he intended to designate by this description.

The words in the certificate "or his legal representatives" cannot be rejected as wholly inoperative. They are there, and must stand as part of the instrument, and some meaning must be attached to them. They are not words of limitation, thrown in to describe the quantity of the estate intened to be granted, but are manifestly employed as descriptive of the person who is to take. Is there any ground for declaring that this expression is synonimous with the term "heirs," and reaches no further? If that had been the idea presented in the mind of the recorder, would not the very word itself have naturally occured to and been adopted by him to express his intention?

The certificate, by its express words, vests the authority to locate in the confirmee "or his legal representatives," not in *him and his* legal representatives. The grant is in the alternative—to one or the other—to him or his assignee, as the fact may be. By this peculiar phraseology, the recorder manifestly intended that the

authority to locate should vest in the confirmee, provided he still continued to be the owner of the land; but if he had parted with his title, by assigning it to another, that then the authority should vest in his assignee, who, in relation to the subject matter, had become his legal representative. There are also reasons for this construction other than those drawn from the words of the instrument itself. The owners of the injured lands were the persons within the contemplation of Congress. They alone were the objects of this public charity. To them, by the very words of the act, it was the duty of the recorder to grant the certificate. Ought not this court, therefore, to presume that this is the class of persons he intended to describe? Will not the court, if possible, so construe the certificate as to make it effectual in securing the bounty of the Government to those for whom it was intended?

By adopting the proposed construction, this object is effected, and the certificate receives that interpretation which is believed to be consistent both with the language of the instrument and the real intention of the officer by whom it was granted. If, on the contrary, the court adjudge that the legal right to locate is vested in the confirmee, without any reference to the fact of his being the owner of the injured land, it is manifest that in all those cases where the confirmee has parted with his title, the intention of the legislature is disappointed, the person entitled to the bounty of the government defrauded, and he who sustained no loss receives by the judgment of this court a benefit that was intended for the actual sufferer.

To this it may be answered that a court of equity can relieve against this construction, by decreeing such persons to be trustees for those who may be really entitled to the benefit of the certificate. This instrument must receive the same construction in equity as at law; and if the court determine that it confers the right to locate upon the confirmee, is it clear that there is any principle of equity by which he can be divested of that right? But if there be, why put a construction upon these instruments not demanded by the words, contrary to the intention of the officer who granted them, and in direct violation of the statute that gave them birth, when the only effect of all this is, at the utmost, to turn a party round to another court for redress? Why not adopt that construction at once, that must in effect at last prevail, and settle by one suit what must otherwise be the subject of double litigation?

This question has been before the court in the case of Gaw v. Hickman, 1 Mo. Rep. 499; Stuart v. Rector, 1 Mo. Rep. 361, and in Wear and Hickman v. Bryant, and Tindall v. Johnson, Mo. Rep. 2 Semi-annual Part, 106, 113; but cannot be considered as definitely settled. It is as yet an open question for adjudication, and one of the last importance to a large class of our land titles.

In the case at bar, however, it is insisted that the title shown by the plaintiff below is equally valid, no matter which of the two suggested constructions of certificate shall be finally adopted by the court.

2. The right to the land located following the right to the certificate by which the appropriation is made, vests in the same person, no matter by whom the location may be made. This appears to be a direct and necessary conclusion from the admitted premises in the case. The certificate is an authority to a particular person to appropriate to his own use a certain quantity of the public land. When the location is made, the authority conferred by the certificate is executed, the certificate has discharged its functions, and the land located has become the private property of the individual who was authorized by the certificate to make the appropriation.

No principle, it is believed, can be stated, upon which the mere fact of making the location can divest the grantee of the certificate of his right, and vest the title to the land located in the locator.

The right to locate may be admitted to be property, and as such the subject of sale, at least in a court of equity. But then if the locator claims to be the assignee of the right of the grantee of the certificate, he must show the fact of the assignment, and an assignment in writing; and the mere fact of assuming to be, and acting as assignee of the certificate granted, cannot possibly invest him with that character, or furnish any evidence of his title to it.

3. The title of the plaintiff below, although not a legal title at common law, is sufficient under our statute to support a recovery in ejectment—Rev. Stat. of 1825, title "Ejectment," sec. 2, Strother v. Lucas; 6 Peter's U. S. Rep.

The defendant below made several specific objections to the plaintiff's title in the instructions which he moved. In answer to such of those as have not already been noticed, it is insisted:

1. The certificate is valid on its face, and even if there be matter out of it sufficient to avoid it, at the suit of the United States, yet it is good to every intent until so

MAY TERM,
1838.

Wear & Hickman
v.
Bryant.

avoided—Rector v. Stuart, 1 Mo. Rep. 361; Wear and Hickman v. Bryant, and Tindall v. Johnson, Mo. Rep., 2 Semi-annual Part, 106, 113.

2. Whether the lot in lieu of which the New Madrid certificate was granted lay within the limits of the county of New Madrid, as they existed in 1812, is a matter behind the grant of the certificate, and a question that can only be gone into between the United States and the grantee of the certificate or his assignee, in a controversy between such parties to contest the validity of the grant—Stuart v. Rector, 1 Mo. Rep. 363; 1 Maryland Rep. 189. But were this point otherwise, the presumption is, that the lot lay within the proper limits, and therefore the court properly rejected the instruction that declared there was no proof to that effect; and what appears upon the face of the certificate as to the legal foundation of the claims, must be taken as true and cannot be contradicted—Hughes' Ky. Land Reports, 43, 134.

3. Whether the certificate was located on land subject to sale by the existing laws of the United States, was not a debatable question between the present parties.

The federal officer charged by the law with that duty made the location, and whether properly or improperly made, it must stand until the Government avoid it—see Hardin, 14; 1 Bibb, 18. But were the law otherwise, the presumption is that all things were rightly transacted; and there being no proof to the contrary, the jury were bound to believe that the land located was subject thereto, and therefore the refusal of the court to direct the jury that they could not find for the plaintiff unless they believe that the land located was at the time subject to sale by the existing laws, could not have prejudiced the defendant, and is of course no ground for reversing the judgment.

4. The right of the person, on whom the certificate confers the authority to locate, to the land located, does not depend for its validity against any, (except, perhaps, the United States,) upon the fact either that such person obtained the certificate, and made the location, or that the certificate was obtained and the location made with his consent and for his benefit.

In 3 Bacon's Abr., title "Grants," (letter I, 6,) it is laid down that "a grant immediately on the execution of the deed, divests the estate out of the grantor, and vests it in the grantee, his assent to an act that is for his benefit being presumed until he dissents"—Thompson v.

Leach, 1 Show, 296; Welt v. Franklin, 1 Bin. 502, 518, 519.

The New Madrid certificate in the present case, immediately upon its emanation, vested in the heirs of St. Aubin a right to appropriate to their own use a specific quantity of the public land, their assent to the grant being presumed, until the contrary appeared. If they dissent, this grant is of course, like all other grants under similar circumstances, void. The grant is to them and none others; they take, or the grant is wholly inoperative. The location, under the direction of the surveyor general, of the land in controversy, by virtue of this certificate, was an actual appropriation of this land to these heirs.

The certificate was the authority to appropriate for their use, and the location the actual appropriation; until the certificate was located, these heirs had the privilege of acquiring a title to a specific quantity of the public land; when the location was made, they actually acquired title to the land located. By virtue then of this certificate and location, the land in controversy is granted to these heirs, provided they assent to the grant; and that they do assent, is a presumption of law until the contrary appears. And can it be material to their title to show that this certificate was procured and this location made by themselves, or some other person acting for them? If the patent had actually issued to them upon this location, would not the legal title have been vested in them, if they assented to the grant? And would this title be avoided by the fact that the certificate, location, and grant were all procured by another, and without their consent, and with no view to their benefit? If one, by fraud, induces the Government to grant land to another, the title is valid so long as the grant remains unrepealed; and in the case at bar, if a stranger has procured this certificate to be issued to these heirs, and caused the location to be made, is not the title in them to whom the grant was made, and can these proceedings vest it elsewhere? But if these circumstances be necessary to the validity of the title of the heirs, their subsequently claiming the land located is a sufficient manifestation of their assent to the grant of the certificate, and to the location of the land thereunder.

5. Neither does the right of the grantee of the certificate to the land located, depend for its validity against any (except the United States,) upon the fact that such person has conveyed the injured land to the United States.

The acquisition of the injured land by the United States may be admitted to form a part of the consideration for the grant of the certificate of new location, but the omission to make the transfer is not a matter that renders the certificate *ipso facto* void. It may be a ground upon which the United States can avoid the grant; but until so avoided, the certificate is valid; the Government may never complain, and a stranger ought not to be allowed to raise an objection that the United States may not deem it wise to insist upon. The judgment of this court in the case before cited, of Stuart v. Rector, is full to this point.

But if a transfer of the injured land to the United States be essential to the validity of the grantee's title, the very act of assenting to the grant of the certificate does, by the terms of the New Madrid law, *ipso facto* pass the injured land to the United States.

The statute declares that when the location is made, the title of the person to the injured land shall revert to, and become vested in, the United States. Congress neither required nor contemplated the execution of a formal conveyance, but manifestly intended that the mere fact of accepting the provisions of this statute should, without any thing further, revest the title to the injured land in the United States. And can there be any doubt as to the power of Congress to cause a title to pass from one to another in this manner? They were at the time the sovereign of the country, and capable of passing such laws as they saw fit. This was not an attempt to deprive a man of his property without his consent, but the mere prescribing of a mode by which he might transfer to another his title to a particular tract of land without the formality of a conveyance in writing; instances of which are to be found in our present statutes.

6. Martin, by his marriage with the daughter of St. Aubin, became entitled to his wife's interest in the land in controversy, during the joint lives of himself and wife, and therefore the defendant's 11th instruction was properly refused—Wear and Hickman v. Bryant, (before cited.)

7. There was evidence to the fact that Felix St. Aubin and Aggate Martin were two of the four heirs of Louis St. Aubin, and therefore the court could not direct the jury as required by the defendant's 16th instruction.

TOMPKINS, Judge, delivered the opinion of the court.

At the August term of this court for the year 1835, this cause was for the first time argued, and the judgment of the circuit court for the plaintiff being reversed; the cause was remanded to be further proceeded in conformably to the opinion of this court then given; for which see Second Semi-annual Part of the fourth volume of the decisions of this court, page 100. The judgment of the circuit court being again in favor of the plaintiff, the defendants come again into this court to reverse that judgment. The evidence given on the last trial is the same as that given on the first, and the only points now to be decided are those left undecided on the first argument of the cause in this court; the rest, though made, are not insisted on now. For a full statement of the case, reference may be made to the first opinion delivered, as above cited. In order, however, to avoid the inconvenience of too frequently recurring to the opinion formerly delivered, some part of the evidence, and so much of the act of Congress of 17th of February, 1815, as is necessary to the decision of this cause, will be transcribed. Its title is " an act for the relief of the inhabitants of the late county of New Madrid, in the territory of Missouri, who suffered by earthquakes." The first section reads thus: "Any person or persons owning lands in the county of New Madrid, in Missouri territory, with the extent the said county had on the tenth day of November, 1812, and whose lands have been materially injured by earthquakes, shall be and they are hereby authorized to locate the like quantity of land on any of the public lands of said territory, the sale of which is authorized by law: provided, that no person shall be permitted to locate any greater quantity of land under this act than the quantity confirmed to him, except the owners of lots of ground or tracts of land of less quantity than one hundred and sixty acres, who are hereby authorized to locate and obtain any quantity of land not exceeding one hundred and sixty acres; nor shall any person be entitled to locate more than six hundred and forty acres," &c. "And, provided, that in every case where such location shall be made according to the provisions of this act, the title of the person or persons to the land injured, as aforesaid, shall revert to, and become absolutely vested in, the United States."

The second section is, that "whenever it shall appear to the recorder of land titles for the territory of Mis-

MAY TERM,
1838.

Wear & Hickman
v.
Bryant.

souri, by the oath or affirmation of a competent witness or witnesses, that any person or persons are entitled to a tract or tracts of land under the provisions of this act, it shall be the duty of said recorder to issue a certificate thereof to the claimant or claimants; and upon such certificate being issued, and the location made on the application of the claimants, by the principal deputy surveyor for said territory, or under his direction, whose duty it shall be to cause a survey thereof to be made, and return a plat of each location made to the said recorder, together with a notice in writing designating the tract or tracts thus located, and the name of the claimant on whose behalf the same shall be made; which notice and plat he shall cause to be recorded in his office," &c. To carry this law into effect, Mr. Bates, then recorder of land titles, adopted a form of certificate with which that given in evidence corresponds. It is as follows: "I certify that a lot of one arpent, in the village of Little Prairie, in the county of New Madrid, which appears from the books of this office to be owned by Louis St. Aubin, has been materially injured by earthquakes, and that in conformity to the provisions of the act of the 17th February, 1815, the said Louis St. Aubin, or his legal representatives, is entitled to locate any quantity of land, not exceeding one hundred and sixty acres, on any of the public lands of the territory of Missouri, the sale of which is authorized by law." The act of Congress seems itself to have suggested to the mind of the recorder the form of certificate which was most suitable for the occasion. In the first proviso of the first section, he found that no person was permitted to locate a greater quantity of land under this act than was confirmed to him, except, &c., as in this case. It readily occured to him that many of the persons to whom the land had been confirmed might not be the owners at the time this act of Congress was passed. To obviate any difficulty arising from changes in the title to the property, he must have employed some words. He chose these words, "legal representatives." By referring to the books of the office, he could easily ascertain to whom any particular tract of land had been confirmed; and the office of the term "legal representatives" was to designate the owner of the land which had been confirmed to Louis St. Aubin, in case he (St. Aubin) had in any manner parted with the title. The plaintiff claims as alienee of two of the heirs of Louis St. Aubin, and the defendants (plaintiffs in error in this court) rely on the certificate of location.

The location of the land in litigation, as certified, is in these words: "Thomas Hickman applies to locate, as the legal representative of Louis St. Aubin, one hundred and sixty acres of land, by virtue of a New Madrid or earthquake certificate, in the name of Louis St. Aubin or his legal representatives, which said certificate is numbered," &c.

The first point now to be decided is the fifth, made on the first argument of the cause in this court, viz: That the circuit court erred in refusing to give the third and fourth instructions asked by the defendant, which in substance are, that unless Louis St. Aubin, or those claiming under him, have relinquished to the United States their lot in New Madrid, in lieu of which the recorder's certificate was granted, and by virtue of which the land in controversy was located, they must find for the defendant; and also, that there was no evidence before them to prove that Louis St. Aubin, or those claiming under him, have relinquished to the United States the lot in New Madrid, in lieu of which the recorder's certificate was granted, and by virtue of which the land in controversy was located.

The second point made in this, and the sixth in the first argument is, that the court erred in refusing to instruct the jury that it was necessary for the plaintiff to show that the location was made by Louis St. Aubin, his children, or those claiming under him.

The third point in this, and the seventh in the first argument is, that the court erred in telling the jury that there was evidence of the consent of the heirs of Louis St. Aubin.

The fourth in this, and the seventh in the first argument is, that the court erred in refusing to instruct the jury, as prayed in the fourteenth instruction, viz: that the location read in evidence by the plaintiff is evidence to prove that Hickman located for himself, and not for Louis St. Aubin or those claiming under him.

1. Whether it be necessary for the plaintiff in the circuit court, and defendant in error, to prove that Louis St. Aubin, or those claiming under him, have relinquished the lot, in lieu of which the certificate was granted, and by virtue of which the land in controversy was located.

The right of location is granted by the first section of the act of Congress above cited; and by the second proviso of that section it is declared, that in every case where a location shall be made according to the provisions of that act, the title of the person to the injured land shall revert to, and become absolutely vested in, the

The act of Congress of Feb. 17, 1815, for the relief of the inhabitants of New Madrid who had suffered by earthquakes, provides that the title of the person who proposes to avail himself of the bounty of Congress to the injured lands shall re-

11

MAY TERM, 1838.

Wear & Hickman
v.
Bryant.

vert to the United States. In establishing his title to land located under this act, the claimant need not prove any formal relinquishment to his New Madrid lands. His acceptance of the provisions of Congress, as evidenced by his application to the Recorder, and his location by the Surveyor, is a virtual relinquishment of his injured land, and assuredly the United States only could complain of the want of a formal conveyance.

United States. To this condition the owner of the injured land assents, when the location is made. The act of Congress requires no other relinquishment than this to be made. The recorder of land titles, on proof of the material injury to the land by earthquakes, issues his certificate in obedience to the requisitions of the law. The certificate is not granted by him, as the counsel for the plaintiff in error seems to have apprehended, but the grant to the land to be located proceeds from the United States to the owner of the injured land, in consideration of his individual sufferings in consequence of the earthquakes. The certificate, then, is evidence only of the right of Louis St. Aubin, or his legal representatives, to locate, on the production of which it becomes the duty of the surveyor to make the location on the maps of his office, according to the application made by the claimant. This being done, the United States require nothing more. But this being done, a mere stranger steps in and requires that to be done which the United States did not require, viz: a relinquishment to be made of the injured land by deed recorded; for, says he, if the United States wish to acquire land from a citizen of Missouri, they must comply with the local law, by taking a deed and having it recorded.

When the United States shall become party to a suit in this court, in which it may be necessary to contend for their right to the injured land, then it will be time enough for this court to determine whether the provision made in this act of Congress to secure that right is such as it ought to have been. At present, the only question before this court is, whether they have the right and power to grant their own land on such terms as they choose to prescribe, and in such manner as seems proper to themselves? Such a question, I should suppose, requires no decision. The circuit court, then, in my opinion, committed no error in refusing to instruct the jury that it was necessary for the plaintiff in the action to prove that Louis St. Aubin, or those claiming under him, have relinquished the injured land to the United States. Through abundance of caution, the circuit court was also required to tell the jury that there was no evidence before them to prove a relinquishment. When the court had refused to instruct the jury that it was necessary to prove a relinquishment, it seems to me that it would have done something worse than useless if it had told them that there was no evidence before them to prove what they had, almost in the same instant, been told was

not necessary to be proved. The memories of jurors ought not to be unnecessarily loaded. In deciding this first point against the plaintiffs in error, the circuit court, as it seems to me, committed no error.

The second point is, that the circuit court erred in refusing to instruct the jury, that it was necessary for the plaintiff to prove that the location was made by Louis St. Aubin, his children, or those claiming under him.

This point is made on the alleged refusal of the circuit court to give the first and eighth instructions, which were, that the jury must be satisfied that the New Madrid certificate given in evidence in this cause, was procured, and the location on the land was made, by the agency and consent of the said Louis St. Aubin, his children, or those claiming under him. The circuit court gave the instructions, with this explanation, viz: Although the certificate was granted and the location made, without the consent of those under whom the plaintiff claims, yet if they afterwards consented, it is sufficient. It is the same in point of legal effect as if they had consented at the time, and that there is evidence of such subsequent consent. The counsel for the defendants, who are here plaintiffs in error, being dissatisfied with this explanation, chose to consider the instructions as refused.

Before this point is investigated, it will perhaps be best to divest the subject of what is mere verbiage, and to endeavor to ascertain the import of some of the terms used. The term "New Madrid certificates" was once much used in popular language to designate the certificates issued by the recorder of land titles, as evidence that the owner of land, certified by him to be materially injured by earthquakes, was entitled to locate on any of the public land, the sale of which was authorized by law. The word "children," it appears to me, is mere surplusage. In Missouri, all children do not necessarily succeed to the estate of the father. Those children which do succeed or take by dissent, are heirs, and all others are purchasers, in the legal acceptation of the word purchaser. Then the words "those claiming under him," (Louis St. Aubin,) include every person who can, in any manner whatever, hold the injured land by title derived from him. The word "children" will therefore be hereafter omitted as a mere expletive, calculated to render the sense more obscure. And the words "those who claim under him," will be used to designate all such persons as may derive title from him, whether as heirs or pur-

Under the provisions of this act, the certificate of the Recorder was issued to the confirmee or his legal representatives, which representatives are those claiming under him by purchase or descent. If this crtificate has been issued, and the location made without the consent of the confirmee or his legal representatives, yet, if they subsequently assent, either expressly or impliedly, the location will enure to their benefit.

MAY TERM, 1837.

Wear & Hickman
v.
Bryant.

chasers. Next in order come the words "legal representatives."

The plaintiffs in error, (says their counsel,) do not claim under Louis St. Aubin, but they claim the located land as the legal representatives of Louis St. Aubin, one of them having applied to locate the land in controversy as the legal reprasentative of Louis St. Aubin, and in the name of the said St. Aubin and his legal representatives. The words, "legal representatives," have no technical meaning, and must, therefore, whenever they are used, be construed according to the subject matter.

A "legal representative," in the most extensive acceptation of those words, is one who legally or lawfully represents another in any matter or thing, of whatever nature or character it may be. Thus, the supreme court of the State of Pennsylvania, in the case of Duncan v. Walker, say that the words "legal representatives" must, in legal contemplation, be the heirs, and not the administrator, because the subject matter in that case was land or real estate; and in the case of Mulanphy's heirs v. Simpson, the president of this court, referring to the above mentioned case of Duncan v. Walker, and admitting its authority, says that the representatives of the deceased must, in legal contemplation, be the executors or administrators, because the subject matter in that case was personal property, or the payment of the debts of the deceased; and the rest of the court concurred with him in the construction of the word "representatives." For Duncan v. Walker, see 2 Dallas, 205; and for Mulanphy's heirs v. Simpson, see 4th vol. Mo. Decisions, p. 319.

What, then, was the subject matter before the mind of the recorder when he certified that Louis St. Aubin, or his legal representatives, is entitled to locate, &c? Lest we might possibly mistake, he points in his certificate to the subject matter, thus: "I certify that a lot of one arpent, in the village of Little Prairie, &c., which appears from the books of this office to be owned by Louis St. Aubin, has been materially injured by eartquakes, and that, in conformity to the provisions of the act of Congress of 17th February, 1815, the said Louis St. Aubin, or his legal representatives, is entitled to locate," &c. The first, and principal provision of that act, it will be recollected, was contained in the first section, to wit, that any person owning land in the county of New Madrid, whose land had been materially injured by earthquakes, shall be authorized to locate the like quantity on any of the

public lands of the territory, the sale of which is authorized by law, provided that he locate no more than had been confirmed to him, except in the case of lots like this of Louis St. Aubin. The recorder being satisfied that material injury had been done to the land, his next duty was to put the owner of that land into possession of such evidence as, under the act, would authorize him to locate. On opening the book in which the confirmations made by the board of commissioners were recorded, he finds that this lot in the village of Little Prairie was confirmed to Louis St. Aubin, and consequently was at the time owned by him; yet the title might have passed from him, and another person might then be the owner; and his business being to designate such person as might have become the owner, either as heir or purchaser, he certified that Louis St. Aubin, or his legal representatives, is entitled to locate. Now, if the definition of the words "legal representatives," above given, supported as it is by the authority of the supreme court of the State of Pennsylvania, and of this court also, be correct, more appropriate words could not have been selected out of the English language; for the legal representative of Louis St. Aubin may be one who legally represents him as owner of the land, either as heir or purchaser, or the legal representative may, according to that definition, be a mere agent, with an authority to locate without any interest in the land located. But if that definition be not correct, then the provident recorder, in the act of certifying, has taken care to point to the provisions of the act of Congress of 17th February, 1815, which must ultimately govern the meaning of those words "legal representatives," as there used.

The legal representative, then, pointed out in the recorder's certificate, can be no other person than the owner of the land injured by earthquakes, and that owner must claim under Louis St. Aubin, either as heir or purchaser. The legal representatives of Louis St. Aubin, and those persons claiming under Louis St. Aubin, are then the same persons. But Hickman applied to locate as the legal representative of Louis St. Aubin, and in the name of said St. Aubin or his legal representatives. Therefore, he applied to locate the land as a person claiming under Louis St. Aubin, either as owner of the injured land, or as agent of some person who did own it; that is to say, the lot of one arpent, in the village of Little Prairie, which the recorder had certified to be materially injured by earthquakes. The certificate of this

MAY TERM, 1838.

Wear & Hickman v. Bryant.

MAY TERM,
1838.

Wear & Hickman
v.
Bryant.

location had been read in evidence. If it proved that the location had been made on the application of a legal representative of Louis St. Aubin, it equally proved that it had been made by a person claiming under Louis St. Aubin as owner of the injured land, or by some person authorized to represent such owner in the application to locate. The circuit court, then, in giving the first and eighth instructions, with the explanations above mentioned, committed no error, in my opinion, of which the plaintiffs in error had a right to complain. It was, as it seems to me, very useless to instruct the jury on the law of implied assent, a thing which, it may be supposed, is not very easy for them to understand. It would have been enough, I think, to tell them that the assent of Louis St. Aubin, or those claiming under him, was a matter which interested themselves and the United States only; that the certificate itself was evidence that the United States were content with the evidence of the assent of those claiming under him; and that even if Hickman had obtained that certificate of the recorder in the most unlawful manner, and had made the application to locate without the knowledge and against the will of those claiming under Louis St. Aubin, yet they alone had the right to disclaim his act; and that so long as they did not disclaim the act, the location must, in law, be considered as made on their application; that is to say, on the application of those claiming under Louis St. Aubin. No error then, as it seems to me, was committed by the circuit court in deciding the second point against the plaintiffs in error.

The third point is, that the court erred in telling the jury that there was evidence of the consent of the heirs of Louis St. Aubin. This is but the echo of the second point, and must, as I think, share its fate.

*The intention of the holder of a New Madrid certificate, in locating for himself, can have no influence in determining the rights of the parties. The bounty of Congress was to the owners of the injured lands, and they only, or those deriving title from them by descent or purchase, can*

The fourth point is, that the circuit court erred in refusing to instruct the jury, as prayed in the fourteenth instruction, viz: That the location read in evidence by the plaintiff is evidence to prove that Hickman located for himself, and not for Louis St. Aubin, or those claiming under him.

In the argument of this point, we are told that it is evident Hickman located for himself, and that it is the duty of the court to give such effect to the location as he intended it should have. When a man, by a written instrument, makes a disposition of his own property, then it is undoubtedly the duty of a court to ascertain, from the writing, his intention, and to construe that wri-

ting accordingly. But, in the present case, the defendant in error has set up a claim to the located land, and the duty of this court is so to decide as to ascertain in whom the property is vested by the act of location, not in whom Hickman intended it should vest. The first section of the act, it will be recollected, declared that any person, or persons, owning land in the county of New Madrid, &c., whose lands have been materially injured by earthquakes, shall be authorized to locate the like quantity of land on any of the public lands of the territory, the sale of which is authorized by law: provided, that in every case where such location shall be made according to the provisions of this act, the title of the person or persons to the land injured, as aforesaid, shall revert to, and become absolutely vested in, the United States.

In conformity to the provisions of the second section of the act, the recorder issued his certificate, above mentioned, as evidence that the owner of the one arpent of injured land was authorized to locate one hundred and sixty acres, in consideration of the injury he had suffered from earthquakes; and in consideration, also, that he agreed that, on the location being made, the lot of injured land shall revert to, and become absolutely vested in, the United States. The question then to be decided is, whether the defendant in error, (who is a purchaser from two of the heirs of Louis St. Aubin, the confirmee of the Government of the United States,) or Hickman, (whose only evidence of title is, that he, having obtained possession of this certificate, in some manner unexplained on the record, went before the surveyor, and applied to locate the land in litigation,) be the rightful owner of the interest of these two heirs in the land? The avowed object of the law-making power, as explained both in the title of the act and in the body thereof, is to relieve the distress of those persons who had suffered by earthquakes, and the means provided, were to give uninjured land in exchange for their injured land. If, then, the person who gets possession of this certificate of the recorder become, by that possession, clothed with all the rights of the owner of the injured land, Congress have legislated to no purpose but to harass the sufferer by putting it into the power of any person who may happen to get possession of the certificate, even in the most unlawful manner, not only to obtain the right of property in the located land, but also to strip the sufferer of his injured land, which, by the act of location, was to revert

be entitled to locate, or to the benefit of the located land; and if any other individual, by fraud or otherwise, get possession of the certificate, it is unavailable to him, unless he be also the descendant or purchaser from the confirmee. Any other construction would frustrate the intentions of Congress; and would not only deprive the sufferer, for whose benefit the act was passed, of his location, but also of his New Madrid land.

to, and become absolutely vested in, the United States—(see proviso to first section, above.) If the language of the act had been equivocal or ambiguous, it would not even then be probable that this construction could be agreeable to the intention of Congress, even at common law—see 1 Bl. Com. p. 91, note 21.

But when we take into consideration that Congress had, by the act of 4th June, 1812, transferred to the General Assembly, composed of a governor, legislative council, and house of representatives, all legislative power necessary for internal government; and to the superior and inferior courts, all judicial power, it is incredible that they should, by mere implication in this act, pretend to prescribe how the rights of property in this located land should be transferred from one citizen to another. And had the act declared in express terms, that any person coming to the possession, whether by accident or fraud, of such certificate, might apply to the surveyor to locate the land for his own use, and by such location, acquire a good title to the located land, to the prejudice of the owner of the injured land, it might well be doubted whether even the territorial courts would not have been in duty bound to declare so much of such act repugnant to the third article of the treaty of cession, of the 30th April, 1803, and therefore void? The language of the act could not, as it seems to me, have been more clear and explicit than it is. The owner of the injured land, from the beginning to the end of the act, is before the mind of the legislature. No change of property is contemplated throughout; it was prudent to leave the transfer of title, whether by descent or purchase, to be regulated by the local law. Indeed, cautious language is used when the recorder is charged to perform his duty; he is directed to issue his certificate to the claimant, thereby intimating to the person receiving it, that he must claim at his own risk, and be prepared to make good his claim under the local law, if it be disputed. I should, myself, hardly have believed that an intimation of this kind could, in ordinary cases, have been necessary. But the act was passed for the relief of persons, most of whom were of the French population, then lately transferred by France from the domain of Spain to that of the United States. Most of them were very imperfectly acquainted with our language, and still less with our laws and institutions. Some of the more uneducated sort might otherwise have believed that the United States intended to confer on the recorder of land titles, or on the

surveyor of public lands, the judicial power necessary to to ascertain who was the true owner of these injured and located lands; with less ceremony, too, than their commandants of posts, under the Spanish government, had decided their paltry actions on personal contracts. Our delegate, then in Congress, probably drew the bill. No person knew better than he did the simplicity of this people; and to his cautious prudence, we are probably indebted for the change of language from the word "owner," used in the first section of the act, to the word "claimant," used in the second section, when the act designates the person to whom the recorder of land titles is charged to issue the certificate, and on whose application the surveyor is charged to locate. The merit by which the counsel for the plaintiffs in error claims this located land for his client is, that he has, in some manner not explained on the record, got possession of a paper belonging to other persons, and that, personating them, he has, on the authority of this paper, applied to the surveyor to locate the land in dispute; and that the surveyor, on his application, did locate it. He says, too, that his client does not claim to hold this land under Louis St. Aubin, but by adverse title, viz: by the title of location. This location is made, too, under the authority of a certificate which no person could lawfully use, unless he derived his claim and right to it either mediately or immediately from Louis St. Aubin, by inheritance or purchase. If, indeed, there be such great merit in the act of location, that the locator should have the located land, then it should be the property of the surveyor, for his is the labor of opening the books belonging to his office to find the map of the township, and after it is found, of marking on the map of the township the plat of the located land; but the law fixes his compensation for this service of making the location, by declaring that he shall be entitled to the same compensation for his services from the party applying, as is allowed for surveying the public lands of the United States—(see second section of the act.) The property in the located land must then, as it seems to me, be vested, immediately on the act of location, in the owner of the injured land, to relieve whose sufferings the act was passed, and whose injured land the United States calculated on acquiring by, and immediately on, the act of location, in exchange for the located land, (see second proviso to first section of the act,) and not in the claimant in this case, who may, for any thing appearing to this court, have come to the posses-

Nor has the locator the *legal* title. Such a location bears no analogy to the case of one man's purchasing land with another's money—the certificate under which the location is made, being granted only on condition that the injured lands revert to the United States, which condition is not complied with where the certificate holder is not also the owner of the injured land or one claiming under him. The certificate is therefore valueless—nor is it *money* or equivalent to money or any negotiable paper, and therefore could not come within the principle alluded to.

sion of the certificate in the most unlawful manner; and the claimant on whose application the land is located, if he has acted without authority, is but in the situation of all other officious persons who porform the labor of another without request, he loses his labor and the money he has so inconsiderately expended; and he ought to be very grateful that the owner of the injured land was content with the location, and did not prefer to demand damages for this unauthorized act of applying to locate.

But it is contended that the plaintiff in error, if he has not a perfect title to the located land, must have at least the legal title, having purchased it from the United States with the certificate of another, which, it is contended, is the same thing as if he had purchased the located land with that person's money. The similarity of the two cases is not obvious to me. In the first place, the United States do not offer the choice of their unsold lands in exchange for those certificates issued by the recorder of land titles, but, as in this case, they grant to the owner of the injured land, in consideration of his having suffered by earthquakes, this located land in exchange for his injured land, then deemed of no value; and the certificate itself was of no value except that it furnished to the surveyor the necessary legal evidence that the owner of the injured land was entitled to locate and set aside for his own use one hundred and sixty acres of the public land. A deposition, taken in due form of law, or a copy from the books of the recorder, would have been necessary to prove the same thing, had not the act of Congress made the certificate legal evidence. But who is the owner of the injured land, must necessarily be determined by the local law, when a doubt arises.

Secondly, this certificate, issued by the recorder of land titles, bears, neither in its character nor on its face, any resemblance to money. Money, intended to pass by delivery as a circulating medium, carries on its face the impression of the sovereign by whose order it is issued, and no person can by inspection ascertain who is its owner. This certificate bears on its face all the information necessary to enable the holder to ascertain who is the owner of the injured land. It announces to him that, at the time of the confirmation, Louis St. Aubin was the owner of that land; and if an alienation, either by death or otherwise, had taken place, the local laws step in and point the attention of the holder of the certificate to the records of the circuit and county courts of New Madrid county for information on that head.

This certificate, moreover, bears on its face the evidence of the consideration on which it was issued. It is therein stated, that this lot of one arpent of land had been materially injured by earthquaks; and it also aptly refers to the act of Congress, of 1815, which authorizes the recorder to certify that the owner of this injured land is authorized to locate, in consideration of the injury sustained, on condition that the injured land shall revert to, and become absolutely vested in, the United States. If such a certificate as this be money, or even negotiable paper, transferable by delivery, then every bond with a condition annexed, and for much better reason, every man's moveable personal property, whether animate or inanimate, is also money, and may be lawfully aliened by any person who may, by chance or othererwise, come into the possession thereof; for a man's horse or cow can bear no mark about it to designate its owner, so distinctly as this certificate does the owner of the injured land, to whom alone the right of location is given by the act of Congress.

Hickman, if he has purchased the interests of the two remaining heirs of Louis St. Aubin in this certificate, (as he probably has, although his counsel have chosen to exhibit him on the record as a mere trespasser,) may have himself a very good equitable title to one half of the located land, but nothing more. If he purchased the interests of those two, believing there were no others interested, he is innocent, and is to be pitied for his misfortune, whether it be the result of negligence or blameless ignorance. But he must, like all others who have been so unfortunate as to purchase from those having no authority to sell, abide the consequences of this misfortune.

If any other construction of this act shall obtain, and be admitted as a precedent in the construction of other laws, it will, in my opinion, amount to a virtual repeal of all the laws by which the rights of property are now guarded and maintained in society.

But it was contended, also, that such was the contemporaneous construction of this act of Congress, of 17th February, 1815; and that a greater part of the titles of located lands depends upon the principle that the person applying to locate as the legal representative of the confirmee of the United States, does thereby acquire the right of property in the located land. Moreover, it was said, that among the owners of the injured land, there were many dishonest persons who did not hesitate to sell

MAY TERM,
1838.

Wear & Hickman
v.
Bryant.

ions of those interested in fixing the construction in the manner contended for by the party using their opinions as argument.

their lands twice, or oftener, when they could find a purchaser; and that unless this court do decide that the person applying to locate, as the legal representative of the confirmee, acquires by the location a good title to the located land, many honest men who have purchased such lands and made considerable improvements on them, will lose their lands, together with the fruits of their labor. It is admitted that the opinion of the bar, at the time these locations were made, was unfavorable to the title by location; but the subject, it was said, had not then been discussed, and the bar, for want of books, was not then what it is now.

The late Chief Justice of the United States, delivering the opinion of the supreme court, in the case of the United States v. Fisher, says, that where the intent (of the law making power) is plain, there is nothing left for construction—2 Cranch, 386. If my view of this statute has been correct, it is one of those where nothing is left for construction. But much deference is due to the opinion of others, whose views of this act of Congress do not correspond with mine. I will therefore bestow some attention on the statement made, with a view to influence the decision of the court. First, with regard to the dishonesty of the vendors of the injured lands. This is so plainly a subject of legislative action *in futuro*, that it seems to me no person could urge it seriously on the attention of a court with a view to influence its decision. Long previous to the passage of this act of Congress of 17th of February, 1815, it had been provided by an act of the territorial legislature, that deeds should be recorded in a given time, on pain of such deed being held fraudulent and void against subsequent purchasers. The time within which they were required to be recorded was several times changed, till at last the first recorded deed was declared to be good, without regard to the time of execution. If the plaintiff, or those under whom he claims, had been guilty of any fraud in this matter against the rights of the defendants, it should have been put in issue before the jury.

Next, then, as to this contemporaneous construction of the act of Congress. It is my misfortune to differ in opinion with the counsel of the plaintiffs in error, so much, that I do not believe that any one purchaser or vendor in the country, either under the territorial or State government, ever calculated at the time of the sale on securing his land by what he calls the title by location. In what manner these applications to locate may have

been made, I know not.   I may not, perhaps, have a due respect for the learning to be derived from a knowledge of the practical construction given to that act by the persons who applied to locate; for I have long been accustomed to believe that no man's construction of a law ought to be respected unless he has read it.   The applications in one of the cases now pending before this court is urged upon its attention by the same counsel, as a specimen of the learned construction put upon this act of Congress by men whose opinions, it is insisted, could be properly estimated only in the present enlightened state of the bar.   In this application, the certificate issued by the recorder is called a New Madrid or earth-quake certificate.   When these expounders of the law are not sufficiently acquainted with it to describe the certificate, the most charitable conclusion is, that they have not had the means of becoming acquainted with it. It might also be reasonably supposed that the surveyor, as a man of common prudence, would require every claimant who applied to locate to state in what charac-ter he applied, in order to prevent, as much as he could, unauthorized persons from interrupting him with applica-tions, and to give persons injured by such unauthorized acts an opportunity of finding out who were the authors of the injury done them.   This, in my opinion, is the true origin of the title by location, a thing, as I have good reason to believe, never thought of by any body who purchased or sold either certificates or located lands, about the time it is asserted this contemporaneous con-struction was so much relied on.

Without troubling myself to refer to the records of deeds to be found in the office of the clerk of the circuit court in Howard county, I could now with very little trouble recollect numerous instances of contracts made and suits decided in the circuit courts, and in the supreme court, too, the history of which plainly shows that purchases were made with a view to securing the title by a regular chain of title, (after a patent could be obtained,) from the confirmee of the United States down to the last purchaser.

But let it be granted, that every purchaser in Missouri, when he made his purchase, did rely on this title by loca-tion; and, also, that there is some obscurity in this act of Congress, which appears to me to be expressed in terms the most plain and perspicuous, let us also move the con-sideration of the injustice that would result to others from such a construction of this act; still this general be-

lief of purchasers would be no such contemporaneous construction as ought to be listened to in a court of law. In the case of Stuart v. Laird, 1 Cranch, 309, Patterson, Justice, delivering the opinion of the court, says: "Another reason for the reversal is, that the judges of the supreme court have no right to sit as circuit judges, not being appointed as such; or, in other words, that they ought to have distinct commissions for that purpose. To this objection, which is of recent date, it is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed a construction. It is contemporary construction of the most forcible nature."

It had been contended by counsel, that the chief justice, who decided this cause in the circuit court, could not exercise the duties or jurisdiction assigned to the court of the fifth circuit, because, by the constitution of the United States, the supreme court has only appellate jurisdiction, except in cases where a State or a foreign minister shall be a party; whence it was concluded that the jurisdiction of the supreme court, being appellate only, no judge of that court, as such, is authorized to hold a court of original jurisdiction. In this case, the contemporary construction was made by all the parties interested. The constitution was the work of the people of the United States. They beheld their representatives in Congress while they were organizing the judicial system. They had not complained of that organization, and the constitution consequently remained unchanged. In the case now before this court, there is an acquiescence of Hickman only. The purchaser from two of the heirs of Louis St. Aubin, and the others similarly situated, did not participate in settling this construction of the law.

Again, Mr. Madison, as in his latter days he informed the people of the United States, surrendered to contemporary construction his constitutional objections to chartering a Bank of the United States. The charter of the first bank was granted by an act of Congress of 1791, and expired on the 4th of March, 1811. In the year 1816, the people of the United States expressed their will, through their representatives in Congress, to charter another bank. If he had, before the 4th of March, 1811, surrendered his constitutional scruples to the contemporaneous construction of stockholders in the old bank, that would have been bad enough; for the interest which they probably felt in continuing an establishment in

which their stock was invested, might have influenced their judgment. But bad as it would have been to respect the construction that might have been put on the constitution by the stockholders in the old bank, much worse would it be to respect this contemporaneous construction of the act of Congress of 17th February, 1815, said to have been given by men much more interested. For the stockholder, in all events sure of his capital, could have felt no interest but that of continuing to receive his accustomed dividend of the profits, instead of profits to be derived from the same capital otherwise employed. Whereas, the claimant under this new title by location is, by his own construction of the act of Congress of 17th February, 1815, to gain the tract of land located, in exchange for the land certified to be materially injured by earthquakes, which is owned by another person, in consideration that the person owning the injured land was one of those who suffered by earthquakes.

Thus much for the fourth point, in which is involved the consideration of this title by location; a title, it is said, not much esteemed by the bar of the day where the locations were made, a bar less enlightened than the bar of the present day for want of books, and because the subject had not been discussed; a title yet well understood by purchasers, without discussion, and generally relied on by them, although they might fairly be presumed to have no law books; a title yet unheard of by me, and as it seems unknown to the circuit judge who has twice decided this cause against the plaintiffs in error, although we two were, during the most busy time of making these locations, the only practising lawyers and conveyancers residing in that extensive tract of country then included in Howard county, in which most of the locations were made; a title yet well known to the counsel for the plaintiffs in error to have been much relied on by purchasers, although he was a stranger in the country till most, if not all, of these locations had been made.

I have not been able to learn from the argument what are the books so necessary to elucidate this title by location. It seems, however, to me, that it would not contribute much to the reputation of the age, either for intelligence or probity, to have given birth to books to sustain such a title. For, unless my views of the subject are very incorrect, the same rule of construing laws which would maintain the plaintiffs in error in this (to me)

new title by location, would equally maintain all those persons (who have hitherto acquired property by means deemed wrongful from time immemorial,) in the possession and enjoyment of whatever thing they may have acquired in their several pursuits. What the several members of the bar of that day may have thought of the title by location, is unknown to me, although personally acquainted with almost every one in the territory; and how the counsel for the plaintiffs in error acquired his knowledge of their opinions, is alike unknown to me, for he was a stranger in the country until some of the prominent members of the bar of that day were no more, and until most of the rest had retired from the bar. All those, whose opinions could be reasonably supposed to have any material influence with the public, resided at St. Louis, which place (because the offices of the recorder of land titles and of surveyor of public lands were there established,) became the principal place of resort for all the land speculators; first, to procure their supply of certificates; and next, to make application to have their locations made. It is true, as he says, that the title by location was but little, if at all, discussed. And so little had I been accustomed to consider it as a point open for discussion, that I cannot now recollect that I ever had even entertained an opinion on the subject till the August term of this court, for the year 1835, when for the first time I heard it proposed for that purpose. I should as soon have expected to acquire a title in fee simple to the lands of my neighbor, purchased from the United States at public or private sale, by delivering a list of them to the county assessor to be taxed in my name as his legal representative, as that Hickman could acquire a title in fee simple, or any other title known by law writers, to this located land, by applying to the surveyor as the legal representative of Louis St. Aubin, to locate "by virtue of this New Madrid or earthquake certificate, in the name of said St. Aubin or his legal representatives." The assessor would much more probably be correctly informed who was the proprietor of each particular tract of land in his own county, than the surveyor, residing in St. Louis, would be informed who was the proprietor of each particular tract of the injured land lying in the county of New Madrid, and consequently of the located land. And the State of Missouri has as much authority to direct the assessor, in his annual progress through each county, to decide the right to all taxable property, on the testimony of the person

delivering him the list thereof, as the United States had to direct the surveyor to decide the right of property in these located lands on the testimony of the claimant applying to locate. But if, on a strict examination, it should be found that the counsel for the plaintiffs in error has committed as great a mistake in counting the number of applications to locate, framed like this above mentioned, as I feel well assured he has committed in ascertaining public opinion concerning this title by location, then, according to his own mode of reasoning, his claim will stand on very narrow ground. The act of Congress, as it seems to me, never contemplated any person owning the located land but the person owning the injured land; and I do not believe that even the person who made this application to locate was weak enough to rest his claim to the located land on such a title, and even if he were so weak, he is not to acquire for that reason what the law did not and could not intend to give him.

For the reasons above given, I am of opinion that the circuit court committed no error in refusing to instruct the jury as prayed in the fourteenth instruction, which is the fourth point made. Being also of opinion that that court committed no error in deciding the three first points for the defendants in error, its judgment ought, in my opinion, to be affirmed; and Judge McGIRK concurring, it is affirmed.

McGIRK, Judge.—I concur in affirming the foregoing judgment, but I am not well satisfied.

EDWARDS, Judge.—On the first point in the opinion just delivered, I entertain no doubt; in regard to that, I concur with the other Judges. On the second point, my opinion is not so clear, but as at present advised, I concur. On the third point, I have no doubt, and concur also. In my view of this particular case, the fourth point is immaterial to either party. In affirming the judgment of the court below, I do not concur with the other Judges.

The defendant below asked the court to instruct the jury, that there was no legal evidence before them to enable them to find for the plaintiff. This instruction the court refused, and this refusal, among other matters, is assigned for error. This instruction is broad. Where there is any evidence to support a recovery, such an instruction should not be given. But here, as I understand the testimony, there was nothing to enable the jury to

EDWARDS, Judge, dissented from the opinion of the court—affirming the judgment below, on the ground that the plaintiff below failed to make out a complete legal

12

MAY TERM,
1838.

Wear & Hickman
v.
Bryant.

title, having offer-
ed in evidence
only the certifi-
cate of the Recor
der and the *appli-
cation* to the Sur-
veyor to locate—
but no actual lo-
cation—no plat of
survey—no notice
of the Surveyor,
&c. as required
by the act of Con-
gress.

find for the plaintiff below, and the instruction should therefore have been given.

In support of his right to recover, the plaintiff below relies upon a written instrument given in evidence, and, in this case, miscalled a location, as I am inclined to believe. The language of this paper is this: "Thomas Hickman applies to locate," and the paper is signed by "Thomas Hickman." If the language had been: "John B. Wallace locates," as in the case of Tindall v. Johnson, it would not have varied the matter. This instrument is not a location, but a mere *application* to locate. Every person who wished to avail himself of the benefit of the act of Congress, had first to get his certificate from the recorder of land titles; next, to make his application to the deputy surveyor for a location; and the instrument, here offered in evidence, is Hickman's application to locate, and in my opinion nothing more. It was competent for any person to make the same application, at the same time, and for the same tract of land. But the application to locate was one thing, and the location made by the "deputy surveyor, or under his direction," was another and a very different thing. Suppose two persons, Hickman and another, for example, had applied at the same time, in the very same terms, to locate the same tract of land, (a thing that might well have happened,) would each application have amounted to a location of the land applied for? If so, each would have had, at the same time, a location for the same land; and as a "New Madrid location," under our statute, will maintain ejectment, each might have maintained ejectment at the same time for the same land. But this instrument, in my opinion, cannot amount to a location; some subsequent action was required upon it. It does not appear that any subsequent step was taken. The deputy surveyor may have rejected it; he may have thought Hickman showed no authority entitling him to claim a location. When a claimant applied for a location, and showed himself entitled to one, it was the duty of the deputy surveyor to make the location—"to cause a survey thereof to be made—to return a plat of such location to the recorder—to return a notice in writing, designating the tract located, and the name of the claimant on whose behalf the location was made; and this notice and plat the recorder was required to cause to be recorded in his office"—see act of Congress, 2, 485, Geyer's Digest. In this case, where is the application to locate? The paper in evidence, signed by "Thomas

Hickman," is the application. Where is the location by the surveyor? This is not in evidence. Where is the plat of the survey? This is not in evidence. Where is the notice of the surveyor to the recorder, designating the tract located, and the claimant? This is not in evidence either. The plaintiffs' right to recover, then, rests upon the naked application of Hickman to locate. If we had the notice of the surveyor to the recorder, it might then be presumed that all the preceding steps necessary in making the location had been taken; but on the mere application of Hickman to locate, it ought not to be presumed that all the subsequent steps necessary to make the location had been taken. This might be presuming the very thing which the officers refused to do. The surveyor may have decided at the very threshold that Hickman had no right to locate. The surveyor was not bound to make a location for every man who applied for one. He was not even authorized to do so, except when the claimant showed himself entitled to a location according to the provisions of the act of Congress. It might well have become the surveyor's duty to reject applications made without authority to locate.

I am of opinion, then, that this instrument was not a "New Madrid location;" that there was no evidence to support the plaintiffs' action; that the court erred in refusing the above instruction; and that the judgment of the circuit court ought to be reversed and remanded.